# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KELLY GILLIS, | No. 4:20-CV-00424 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| LYCOMING-CLINTON COUNTIES COMMISSION FOR COMMUNITY ACTION (STEP), INC., | |
| Defendant. | |

## MEMORANDUM OPINION

### JUNE 1, 2022

Plaintiff Kelly Gillis was denied a promotion while out on approved medical leave. After she expressed displeasure about the decision, her employer, the Defendant, revoked her access to the organization's network and building—effectively preventing her from doing her job. These facts create an inference of retaliatory discrimination. They do not, however, make a winning case. The Defendant offers legitimate, non-discriminatory reasons for its actions—namely, Gillis's history of conflict with the organization's senior management and its concerns about the risks associated with allowing a disgruntled Gillis access to sensitive, confidential information—that she has not rebutted. Accordingly, the Defendant's motion for summary judgment is granted.

## I.    BACKGROUND

### A.    The Early Days

In 2012, Gillis was hired as the Controller for Lycoming-Clinton Counties Commission for Community Action (STEP), Inc., a publicly-funded community organization that operates community centers and provides specialized services for the elderly and underprivileged children and their families.[1] An accountant by trade, Gillis oversaw STEP's legal and regulatory compliance efforts regarding the organization's financial functions and created and enforced STEP's internal accounting policies and procedures.[2]

After four years in that role, Gillis received a promotion—in title, if not in responsibilities—and became the Assistant to the Chief Financial Officer.[3] According to Gillis, the organization was preparing succession plans for all key management positions, and STEP's Chief Financial Officer ("CFO"), Staci Lowe, informed Gillis that she would assume the CFO position when Lowe retired or resigned.[4] Gillis believed STEP's leadership team memorialized the succession

---

[1]  *See* Doc. 27-2, Ex. B at 91–92 (Gillis Dep. Ex. P10 – Gillis CV); *see also* Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 19:9–23:10 (explaining STEP's function, operations, and funding sources).

[2]  Doc. 27-2, Ex. B at 91–92 (Gillis Dep. Ex. P10 – Gillis CV).

[3]  *Id*.

[4]  Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 68:1–8 ("[Q.] What succession plan are you referring to? A. There was succession planning being done at that time for all the key management positions. And it was communicated to me via Traci [Lowe] that I was the succession plan for her position.").

plan in writing, but she could not recall ever seeing the document.[5] Regardless, Gillis discussed the succession plan with a member of STEP's Board of Directors, Aaron Carter,[6] and one of the accountants who reported to her, Patricia Kiessling.[7] And Lowe later confirmed that "[t]he Assistant Chief Financial Officer position was created to be an extension of the responsibilities of the [CFO], act on behalf of the CFO when the CFO was not present, and ultimately to succeed the CFO."[8]

Throughout her time at STEP, Gillis received positive performance reviews and was consistently commended for her "expertise and work ethic."[9] For each evaluation period on record, Gillis was given the highest possible overall performance rating ("Exceptional" or "Exceeds Expectation," depending on the evaluation period).[10] Relevant here, Gillis also always received strong marks on the review category titled "Teamwork and Customer Service."[11]

---

[5]   *Id*. at 68:9–13 ("Q. Did you ever see a succession plan that was in written form? A. I can't recall if I saw the written form. But I do believe it does exist, yes.").

[6]   *Id*. at 70:6–11 ("Q. Did you ever have that conversation [regarding the succession plan] with any board member that you can recall? A. Yes. Q. Which board member or members? A. I would say Aaron Carter.").

[7]   Doc. 27-7, Ex. G (Mar. 17, 2021 Kiessling Dep.) at 47:14–48:4 ("Q. Were you aware of any, prior to March 6 of 2019, whether STEP had any succession planning in place for when or if [Traci Lowe] retired or left? A. Only what I was told by Kelly [Gillis]. Q. And what were you told? A. That her position changed from controller to assistant CFO, and that she would be the successor to the CFO whenever she retired. Q. And when did that discussion take place? A. I don't recall the date, I believe when she became the assistant CFO. Q. So this would have been prior to March 6 of 2019 when you met with Mr. Plankenhorn? A. Yes.").

[8]   Doc. 27-4, Ex. D at 368 (Plankenhorn Dep. Ex. D7 – Oct. 17, 2019 Lowe Letter).

[9]   Doc. 27-4, Ex. D at 313–57 (Plankenhorn Dep. Ex. D3 – Gillis Performance Reviews); *see*, *e.g.*, *id*. at 316 ("Her expertise and work ethic is top-notch!"), 318 ("Kelly's work ethic is exceptional.").

[10]  *Id*.

[11]  *Id*. at 314 (April 1, 2017 – March 31, 2018: "Teamwork and Customer Service" rating of "Exceptional – 5"), 316 (October 21, 2015 – April 2, 2017: "Teamwork and Customer Service"

But these positive reviews present an incomplete picture of Gillis's time at STEP. Indeed, despite the praise and high marks that Gillis received in her annual assessments, it seems that Gillis was consistently at loggerheads with her colleagues in the finance department and, most importantly, with STEP's senior management.

For example, in 2016, STEP's Human Resources Director, Jean Myers, investigated an "[o]ngoing conflict" between Gillis and an accountant she supervised, Barb Griffith.[12] The conflict came to a head after Griffith submitted a travel expenses invoice to Gillis, who then returned the invoice to Griffith with written comments that made Griffith "feel like a 3rd grader."[13] Griffith emailed Gillis (copying Myers and Lowe), "I have walked on eggshells around you for the last two months," explaining, "I feel like you have placed a target on my back, that is never going to go away."[14] After completing the investigation, Myers recommended a written warning to Griffith for "insubordination and other disrespectful conduct," and "management and/or leadership training" for Gillis.[15]

---

rating of "Exceptional – 5"), 318 (October 21, 2014 – October 20, 2015: "Teamwork and Customer Service" rating of "Exceeds – 4"), 331 (October 21, 2013 – October 20, 2014: "Teamwork and Customer Service" rating of "Exceeds – 4"), 345 (October 21, 2012 – October 20, 2013: "Teamwork and Customer Service" rating of "Exceeds – 4").

[12] Doc. 27-4, Ex. D at 362–64 (Plankenhorn Dep. Ex. D5 – Mar. 21, 2016 Summary of Fact Finding).

[13] *Id*. (internal quotation marks omitted).

[14] Doc. 27-6, Ex. F (Mar. 16, 2016 Griffith Email).

[15] Doc. 27-4, Ex. D at 362–64 (Plankenhorn Dep. Ex. D5 – Mar. 21, 2016 Summary of Fact Finding).

Myers concluded that Gillis "lacks some of the necessary skills to deal with personnel issues."[16]

Additionally, by Gillis's telling, "[o]ver the years," she "had multiple issues with leadership including Terry Roller and Jean Myers."[17] Roller is STEP's former Chief Strategy Officer ("CSO") and Chief Executive Officer ("CEO"); as noted, Myers is STEP's HR Director.[18] According to Gillis, Roller "did not care for [her] because [she] was not a 'yes' man."[19] Gillis asserts that because she has "never been afraid to voice [her] opinion when it came to what [she] felt was in the best interest of [STEP]," she experienced "harassment" by Roller through "accusations that were unfounded and untrue."[20] Gillis claims that she "was never given the option to defend [herself] as these were always taken to Jim Plankenhorn," STEP's current CEO.[21]

---

[16] *Id*.; *see also* Doc. 27-4, Ex. D at 358 (Plankenhorn Dep. Ex. D4 – Mar. 21 2016 Gillis Performance Improvement Plan) (noting the following "Areas of Concern": (1) "Communication – lack of consistency when communicating with all staff"; (2) "Leadership – lack of disciplinary actions when necessary including feedback and documentation"; and (3) "Collaboration – lack of following through on purchasing project").

[17] Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[18] Doc. 25 at 19.

[19] Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[20] *Id*.

[21] *Id*; *see also* Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 30:13–31:7 ("[Q.] Any specifics that you can give me about what Mr. Roller may have discussed with Mr. Plankenhorn that reflected ultimately Mr. Plankenhorn's personal feelings toward you? A. Sure. Okay. I know that there were instances where Terry would tell Jim that he—that I was not working with him, and I was not providing him with the information that he had requested. I know on one particular time Traci [Lowe] came to me and asked me about it. And I was able to provide the documentation to her that I had sent it to Terry. And he did receive everything he had asked for. And I mean but that was—that was a common occurrence with Terry as far as his communication with Jim that I'm aware of through Traci."), 87:21–88:9 ("Q. How would you characterize your relationship with Terry Roller while he was employed at STEP and you were

Regarding Myers, Gillis asserts that "[o]ver the years, she has done a poor job in Human Resources but has been rewarded for her lack of performance."[22] Gillis claims that "there have been multiple instances where [she] questioned the way certain things were being done, and . . . pointed out errors or issues," but "[e]very time that this occurred, [Myers] retaliated against [her] or the fiscal department."[23]

As Gillis understands it, "the constant factor in this is Jim Plankenhorn."[24] Gillis explains that "[a]ll of [Myers's] complaints/accusations were communicated . . . to Jim Plankenhorn in private meetings, and eventually in meetings with Traci Lowe," and, as a result, she "never had the opportunity to defend [herself] for anything that was said."[25] Although there were no "particular instances with Jim Plankenhorn directly," Gillis feels that Plankenhorn "would just take whatever [Roller and Myers] said at face value," and, as such, she "assumed that [Plankenhorn] did not like [her]."[26]

---

employed at STEP? A. Difficult. Q. In what sense was it difficult? A. I wasn't always a yes man. I would voice my concerns, opinions and sometimes—a lot of times people don't like that."), 176:24–177:17 ("Q. You had issues with Terry Roller, that you'll acknowledge. Correct? A. That is correct. . . . Q. And you had issues with him when he was the CEO. Correct? A. I don't know. I would not say that, no. I would say that he had issues with me. Q. All right. So whether you had issues with him or he had issues with you, there were issues between you. Correct? A. Yes.").

[22]  Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[23]  *Id.*; *see also* Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 177:18–23 ("Q. And you had issues with Jean Myers. Correct? A. Correct. Q. And she was the HR director? A. Yes.").

[24]  Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[25]  *Id*.

[26]  Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 31:17–24 ("Q. How did that reflect on Mr. Plankenhorn's personal feelings toward you? What about that situation do you believe

6

## B. The Injury and Exit

On February 8, 2019, Gillis had surgery on her right shoulder to repair a torn rotator cuff.[27] After the surgery, Gillis was unable to perform "all the computer work" and "handwriting."[28] Accordingly, Gillis applied for paid leave under the Family and Medical Leave Act ("FMLA").[29] STEP approved Gillis's FMLA leave, with a start date of February 11, 2019, and an end date of April 1, 2019.[30]

While on leave, Gillis applied for a Compliance Manager position with Woodlands Bank.[31] She interviewed for the position on February 26, 2019.[32]

Six days later, STEP's CFO, Traci Lowe, unexpectedly submitted her retirement notice.[33] According to Plankenhorn, Lowe's retirement placed STEP in a difficult position because "[w]ith her leaving, that [made] three in the Fiscal Department (one other retirement and one to a better job) departing [STEP] during the month of March [2019]."[34] Indeed, accountant Patti Kiessling provided STEP

---

reflected Mr. Plankenhorn's personal feelings toward you? A. I feel that he would just take whatever they—whatever he said at face value."), 178:2–24 ("Q. And you had pre-existing issues with Jim Plankenhorn. Correct? [A.] I assumed that Jim did not like me. There weren't particular instances with Jim Plankenhorn directly. Q. Well, you felt that he was listening out of school if you will to Terry Roller and Jean Myers without betting back to you and you felt that was inappropriate. Didn't you? A. Correct. Q. Okay. So you had an issue with that. Correct? A. Correct.") (objections omitted).

[27] Doc. 31-1, Ex. C (Feb. 8, 2019 Gillis Operative Report).
[28] Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 65:7–13.
[29] Doc. 31-1, Ex. D (Feb. 20, 2019 Plankenhorn Letter).
[30] *Id.*
[31] Doc. 27-2, Ex. B at 85 (Gillis Dep. Ex. P7 – Feb. 19, 2019 Gillis Email).
[32] Doc. 27-2, Ex. B at 86 (Gillis Dep. Ex. P8 – Feb. 26, 2019 Karney & Gillis Emails).
[33] Doc. 26 ¶ 15; Doc. 32 ¶ 15.
[34] Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email); *see also* Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 206:3–7 ("Q. Losing 57 percent of your fiscal department staff, that would be a bad thing. Correct? A. It is.").

with her resignation letter on February 19, 2019, after receiving an offer to join

Hope Enterprises as their controller.[35]

Plankenhorn acted quickly to fill the CFO position. Despite the existing

succession plan, Plankenhorn decided not to promote Gillis. He outlined his

reasoning in an email to outside counsel sent February 4, 2019 (i.e., the day Lowe

announced her retirement):

> I want to run a scenario past you and get your
> perspective. Today Traci Lowe submitted her retirement
> resignation effective the end of the month. With her
> leaving, that makes three in the Fiscal Department (one
> other retirement and one to a better job) departing here
> during the month of March!
>
> If you recall, I have provided to you some significant
> concerns I have with our current Assistant CFO, Kelly
> Gillis. She is a fantastic accountant but does not project
> and promote the inter-personal skills I feel . . . necessary
> in her current position let alone moving forward if she
> were to take on the CFO role. She has rubbed many
> people the wrong way, including my HR Chief (Jean
> Myers), Terry [Roller] back when he was here, as well as
> quite a few program managers/directors. I have spoken
> with Traci about my concerns many times over the past
> several years and to be quite honest, Traci has not been
> able to affect any positive change. It is parament for me
> to promote, foster, and require the type of atmosphere
> that has both fiscal and operations working together as a
> cohesive team. Based upon all my observations, while
> there are some in operations that are not the most
> capable, they have good attitudes and are willing to work

---

[35]  Doc. 27-7, Ex. G (Mar. 17, 2021 Kiessling Dep.) at 39:15–40:1 ("Q. So backing up, you were
offered the job at Hope Enterprises of controller in February of 2019. Correct? A. Yes. Q. And
then did you put in your resignation letter with STEP? A, Yes. Q. And do you know the date
of that or the approximate date? A. I believe it was President's Day, so, what, February 18, 19,
so the day after President's Day.").

together. In my opinion, while Kelly may be highly
capable, she lacks the people skills and therefore I cannot
trust or have confidence in her ability to lead the way I
feel the department or the agency needs to be lead.

All that said, I am not planning to consider Kelly moving
into Traci's role.

What I am thinking about doing, however, is talking with
Patti Kiessling about the position. Patti is the one person
leaving (last day at the end of this week) and of course, is
supervised by Kelly. Patti has great potential.

Do you feel I have any obligation (from a risk
management perspective) to offer the position to Kelly?

Trust me, I fully expect there could/will be more fallout
from the decision not to consider Kelly. I also expect she
will move on and try to hurt me and/or the agency in the
process. However, I feel strongly that for STEP to move
forward and have the type of respectful
culture/environment I feel is necessary, I cannot see
promoting her into a more responsible position. Bottom
line, we might take a step or two more backwards before
we go forwards. I guess I am willing to do this.[36]

Consistent with this email, Plankenhorn reached out to Kiessling and asked

if she was interested in the CFO position.[37] Kiessling has a bachelor's degree in

business administration / accounting and, as of March 2019, had been an

accountant at STEP for approximately six years.[38] Prior to that, she served as the

Chief Financial Officer of the Hutchinson Real Estate Development Company,

Director of Finance / Assistant Treasurer of Webb Communications Inc., and VP

---

[36]   Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email).
[37]   Doc. 26 ¶ 18; Doc. 32 ¶ 18.
[38]   Doc. 27-4, Ex. D at 402–03 (Plankenhorn Dep. Ex. D16 – Kiessling CV).

of Finance and Administration at JA Webb Inc.[39] That said, Gillis considered (and

considers) Kiessling unqualified for the role because "[s]he did not have any

experience with preparing the financial statements and in particular the SEFA, the

scheduled expenditures of federal awards, which is imperative in that position [i.e.,

CFO]."[40] Regardless, Plankenhorn offered Kiessling the job, and she accepted.[41]

On the morning of March 7, 2019—unaware that Plankenhorn had already

decided to offer the CFO position to Kiessling—Gillis emailed Plankenhorn to

inquire about the opening:

> Traci and I spoke about whether or not I have interest in
> the CFO position. Before I decide either way, I would
> like to get your perspective on what your plans are in
> filling the position. If I decide that I am interested in
> pursuing the position, would the succession plan that has
> been in place be followed or is it your intention to
> advertise the position for a third party or another
> individual to fill it?
>
> If you could let me know, I'd greatly appreciate it.[42]

Less than forty-five minutes later, Plankenhorn sent Gillis a separate email

informing her the job was going to Kiessling:

> Sorry to be contacting you this way but I'm trying to be
> respectful of your FMLA and not sure when you are or
> are not working. I would prefer to speak to you in person
> but the timing of this is extremely critical and it is very

---

[39] *Id.*

[40] Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 78:16–79:2.

[41] Doc. 26 ¶ 25; Doc. 32 ¶ 25; Doc. 27-4, Ex. D at 371–72 (Plankenhorn Dep. Ex. D9 – Mar. 8, 2019 Plankenhorn Email).

[42] Doc. 27-2, Ex. B at 95 (Gillis Dep. Ex. P12 – Mar. 7, 2019 K. Gillis Email).

important to me to do things in an as appropriate and
confidential manner possible.

I just wanted to let you know that after giving it a
tremendous amount of thought and consideration, I
offered the CFO position to Patti [Kiessling]. She did
accept and will assume the role effective March 30.[43]

Gillis wrote back, "Wow, I'm surprised that this decision was made without even

speaking to me about it before hand. I'm not happy about this turn of events, but

ultimately it is your decision."[44] And an hour later, responding to a separate email

from Plankenhorn, Gillis emailed Plankenhorn and Lowe that "[a]s soon as I have

the final draft of the audit to the auditors, I will be using my FMLA as much as

possible and will only work when absolutely necessary so that I can concentrate on

my physical therapy and recovery from here on out."[45]

Later that day, Plankenhorn sent Gillis the following text message:

Hey Kelly – I just wanted to let you know, based upon
my desire to ensure you can focus on what's most
important, your recovery, I asked [Gene Good (STEP,
Chief of IT)] to take you off the network. You said you
need to concentrate on therapy and recovery and I agree
100% and don't want us asking or expecting work from
you during this time. Please let HR know what
availability you have and we'll go from there. Thanks –
Jim.[46]

---

[43] Doc. 27-2, Ex. B at 96–97 (Gillis Dep. Ex. P13 – Mar. 7, 2019 J. Plankenhorn & K. Gillis
Emails).
[44] *Id.*
[45] Doc. 27-2, Ex. B at 73 (Gillis Dep. Ex. P4 – Mar. 7, 2019 Gillis & Plankenhorn Emails).
[46] Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn &
Gillis Text Messages).

Gillis responded, "Jim, I appreciate that but at the same time, my FMLA paperwork clearly states that I can answer emails, etc. If you feel this is in the best interest for the agency, then that is fine but I can't guarantee that many requirements of grants, etc will be taken care of if I don't have access to email."[47]

The following morning, Plankenhorn emailed his outside counsel an update on the situation:

> I offered the CFO position to the [Kiessling], and she accepted.
>
> As predicted, this has made [Gillis] very upset. She is out on FMLA and cleared to work part-time from home. She quickly communicated to me and Traci (e-mail) that she should only be asked to work if absolutely necessary as she needs to focus her attention on her recovery and therapy. She also asked Traci to come to her home and pick up the files she was working on. With that statement, that action, and as upset as she is to the information, I had her locked out of the fiscal database, including our network (e-mail, work files, etc.). I felt (feel) there may a risk to the agency.
>
> Couple of questions – We can lock her out of the fiscal database but give her access to e-mails. Your thoughts on doing that? My response to her this morning was going to be, quite simply, I will have all her e-mails come to me and I would monitor them for any grant announcements, etc. This was her concern, that she wouldn't be able to monitor these things.
>
> I'd like to hear your thoughts on whether I can and should take a snapshot of her e-mail traffic before I give her access back to them. If we do decide to give her access. I am just wondering if that is prudent and allowable. I am hesitant to go this route as I promote and

---

[47]  *Id*.

adhere to confidentiality and privacy as much as possible. Just wondering your thoughts on this and maybe my next comment/question will help you see my direction.

I am at a point where I feel very strongly that she should not be an employee of STEP. As good of an accountant as she is, I am not comfortable with all the many negative aspects of her inter-personal working skills, personality, and what I believe to be control issues. We, as an organization, I believe, cannot move forward with her here. I'd like to hear your thoughts on whether you feel I am in a position to break the working relationship. I know there is significant risk in the sense that this will just start the next chapter of the relationship...legal.

As I mentioned she is currently out on FMLA and I really don't expert her back until the 12 weeks is up. It's hard to gauge that right now since she has been cleared to work from home...maybe April. I am assuming anything we are strategizing now might need to wait until she comes back and I am fine with that.[48]

After speaking with his attorney, Plankenhorn sent Gillis an additional text:

Kelly – After talking with the attorney, the plan is for us to monitor your e-mails too. And for consistency, I went ahead and had Jeff deactivate your key fob for now too. As you communicated, and I agree, your priority is and should be your therapy and recovery. If anything comes up that we consider to be absolutely necessary, we'll contact you through the phone. Please keep HR updated on your situation and I look forward to you coming back with no restrictions.[49]

---

[48]   Doc. 27-4, Ex. D at 371–72 (Plankenhorn Dep. Ex. D9 – Mar. 8, 2019 Plankenhorn Email).

[49]   Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn & Gillis Text Messages).

Consistent with these messages, Plankenhorn revoked Gillis's access to STEP's network (which included her work email address) and deactivated her office key fob, which allowed her to enter the STEP building.[50]

On March 12, 2019, Woodland Bank offered Gillis the Compliance Officer position she applied for in February.[51] Gillis accepted and then promptly sent Traci Lowe her resignation letter, explaining, "Unfortunately, fulfilling my duties to the ethical and moral standards that are necessary has become inherently more difficult due to Mr. Plankenhorn's personal feelings towards me, which has resulted in creating a hostile work environment."[52] The letter makes no mention of her disability and does not attribute either Plankenhorn's "personal feelings towards [her]" or the alleged "hostile work environment" to her decision to take FMLA leave.[53]

On March 19, 2019, a STEP representative contacted the regional office of Head Start—the federal early childhood education program that provides STEP

---

[50]   Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 250:6–14 ("Q. And in response to that e-mail that you received, you also revoked her e-mail at STEP. Correct? A. That is correct. Q. And you also deactivated her key fob to get entry to the building. Is that correct? A. That is correct."), 252:1–20 ("Q. And—and what type of threat are we—are we talking about here? So let's—you revoked her e-mail access. So you didn't want her communicating with anybody at STEP. Correct? A. My understanding is I revoked her network access, which included e-mail. So we monitored the e-mails, Ms. Lowe monitored the e-mails. So she didn't have access to the network, which would include, you know, the personnel pieces to the fiscal files. And whatever—whatever information is included in that, payroll. So, yes, she had access to a lot of sensitive information. And so revoking access to the network, I believe, was also revoked access to the e-mail, in that sense.").

[51]   Doc. 27-2, Ex. B at 88–90 (Gillis Dep. Ex. P9 – Gillis, Karney, & Farley Emails).

[52]   Doc. 27-2, Ex. B at 52 (Gillis Dep. Ex. P1 – Mar. 12, 2019 Gillis Resignation Letter).

[53]   *Id.*

funding for its educational programming[54]—to disclose that Lowe was set to retire at the end of the month.[55] STEP asked whether "there [is] something we need to do or submit in the hiring process," and Head Start responded, "Once you have a candidate in mind, submit a key hire request to the [Regional Office]."[56] The following day, Plankenhorn sent a letter to the Head Start Regional Office "requesting approval for the replacement of the current STEP CFO," explaining that Kiessling "is the person I feel is most qualified."[57] Plankenhorn attached Kiessling's resume and thanked Head Start for its consideration.[58] Head Start approved Kiessling as STEP's new CFO on April 10, 2019[59]—approximately two weeks after Kiessling started in that role.[60]

According to Gillis, her doctor allowed her to work half days starting April 3, 2019.[61] STEP then lifted at least some of her work restrictions,[62] and Gillis

---

[54]   Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 286:15–20 ("Q. And I think you told me earlier that the programs that STEP helps provide with the Head Start funding are for young, early education programs? A. Correct.").

[55]   Doc. 27-4, Ex. D at 387–93 (Plankenhorn Dep. Ex. D.14 – Mar. 19, 2019 Romero, Hawk, Abbott, & Plankenhorn Email Chain).

[56]   *Id.*

[57]   Doc. 27-4, Ex. D at 394 (Plankenhorn Dep. Ex. D15 – Mar. 20, 2019 Plankenhorn Letter to Romero).

[58]   *Id.*

[59]   Doc. 27-4, Ex. D at 383–85 (Plankenhorn Dep. Ex. D12 – Apr. 10, 2019 STEP Head Start Policy Council Minutes).

[60]   *See* Doc. 27-2, Ex. B at 96–97 (Gillis Dep. Ex. P13 – Mar. 7, 2019 J. Plankenhorn & K. Gillis Emails) (Plankenhorn explaining that he offered the CFO position to Patti [Kiessling], and she "accept[ed] and will assume the role effective March 30").

[61]   Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[62]   Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 54:22–55:2 ("Q. Did you physically return to working at STEP at STEP's offices? A. I did. Q. And at that point in time did you have restrictions in your access to information? A. Not at that time, no. Q. So the restrictions and access were only during the period of time that you were away from the premises and not

"returned to work and completed everything that was asked of [her]" before she officially left the organization on April 9, 2019.[63]

## C.    Procedural Posture

On July 8, 2019, Gillis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation and disability discrimination.[64] In preparation for her initial interview with the EEOC, Gillis prepared a summary of "[i]mportant [b]ack story details" that included the "multiple issues with [STEP] leadership" she had "[o]ver the years"—which, she wrote, "resulted in harassment" and "retaliat[ion]"—but emphasized that "[t]he main issue at hand is the violation by Jim Plankenhorn of [her] rights under the Americans with Disabilities Act."[65] According to STEP, the EEOC dismissed Gillis's complaint on January 7, 2020, "determining that based on the information provided it could not establish violations of the statutes."[66]

---

physically reporting on site. Is that fair to say? A. Actually can—I do believe that my access to the accounting system was never reinstated. I do believe that is accurate."), 58:22–59:5 ("Q. And then when you went back to STEP at the physical premises you were able to access at least some of your records? A. Correct. Q. And that would have been different from the situation when you were at home? A. Yes.").

[63]  Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

[64]  Doc. 27-1, Ex. A (July 8, 2019 Charge of Discrimination).

[65]  Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint); *see also* Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 123:11–17 ("Q. And is this something that you presented to the EEOC as part of your complaint process? A. I am not sure if I presented [it] to the EEOC or just had it with me to summarize. I don't know if I gave them a copy or not. I can't remember.").

[66]  Doc. 25 at 9.

The EEOC then issued Gillis a Notice of Right to Sue,[67] and she obliged, filing her four-count Complaint on March 12, 2020, alleging violations of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), the FMLA, and the Pennsylvania Human Relations Act ("PHRA").[68] After the parties completed discovery, STEP filed a motion for summary judgment.[69] That motion has been fully briefed and is now ripe for disposition.[70]

## II.   LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[71] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[72] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[73] Conversely, to survive summary judgment, a plaintiff must

---

[67] *Id.*

[68] Doc. 1 ¶¶ 47–52 (Count I – Title VII), 53–58 (Count II – ADA), 59–64 (Count III – FMLA), 65–69 (Count IV – PHRA).

[69] Doc. 24.

[70] Doc. 25; Doc. 31; Doc. 35.

[71] Fed. R. Civ. P. 56(a).

[72] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[73] *Clark*, 9 F.3d at 326.

"point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[74]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[75] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[76] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[77] Instead, it must "identify those facts of record which would contradict the facts identified by the movant.'"[78]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[79] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[80] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[74] *Id.*

[75] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[76] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[77] *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[78] *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002).

[79] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[80] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[81] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[82]

## III.   ANALYSIS

Gillis asserts that STEP discriminated and retaliated against her in two ways: (1) STEP's "refusal to promote her and/or denial of the opportunity to be considered for the position of CFO was motivated by her exercising her FMLA right to leave and/or her disability"; and (2) Plankenhorn, STEP's CEO, "retaliated against her utilizing her FMLA leave by revoking her email access, revoking her access to financial databases, and locking her out of the building."[83] According to Gillis, this "discriminatory and retaliatory conduct" violated the FMLA, ADA, and PHRA.[84]

To prevail on her retaliation claim under the FMLA, Gillis "must show that (1) [she] took an FMLA leave, (2) [she] suffered an adverse employment decision,

---

[81]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[82]   Fed. R. Civ. P. 56(c)(3).

[83]   Doc. 31 at 7.

[84]   As noted, Gillis's Complaint also includes a Title VII claim. *See* Doc. 1 ¶¶ 47–52 (Count I – Title VII). Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). But the Complaint contains no allegations about, and discovery exposed no evidence of, discrimination on the basis of race, color, religion, sex, or national origin. Indeed, in her Opposition to STEP's motion for summary judgment, Gillis makes no mention of her Title VII claim. *See* Doc. 31 at 1 ("Defendant's discriminatory and retaliatory conduct . . . violated the Americans with Disabilities Act, the Family Medical Leave Act, and the Pennsylvania Human Relations Act.") (internal citations omitted). Accordingly, Count I does not survive summary judgment.

and (3) the adverse decision was causally related to [her] leave."[85] For her claims under the ADA and PHRA, Gillis needs to establish that "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."[86]

For claims of discrimination and retaliation under the FMLA, ADA, and PHRA, courts apply different legal standards based on the type of evidence the plaintiff presents. Specifically, "claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*."[87] Here, Gillis asserts that she has established direct evidence of discrimination,[88] and, alternatively, that she has presented sufficient circumstantial evidence to establish discrimination under the more taxing *McDonnell Douglas* standard.[89] The Court addresses each argument in turn.

---

[85]  *Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

[86]  *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999); *see also id.* (explaining that it "will only discuss [the plaintiff's] ADA claim because [its] analysis of an ADA claim applies equally to a PHRA claim").

[87]  *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–78 (1989) (O'Connor, J., concurring)).

[88]  Doc. 31 at 10–15.

[89]  *Id.* at 16–23.

## A.     Direct Evidence

Under the *Price Waterhouse* direct evidence analysis, courts assess first whether the plaintiff presents direct evidence of discrimination "so revealing of discriminatory animus that it is unnecessary to rely on the *McDonnell Douglas* burden-shifting framework."[90] If a plaintiff produces direct evidence, "the defendant has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory animus."[91] A defendant's failure to carry this burden compels the court to conclude that it made the adverse employment decision "because of" consideration of the illegitimate, discriminatory factor.[92]

The Third Circuit holds that to qualify as direct evidence of discrimination, the plaintiff's proffered evidence "must be sufficient on its own to allow a factfinder to determine that [the illegitimate factor] was the but-for cause of the [employment] decision."[93] Put differently, direct evidence "must prove the existence of the fact in issue *without inference or presumption*."[94] When the plaintiff asks to trier of fact to "*infer* the discrimination . . . from an employer's

---

[90]  *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (internal quotation marks, brackets, and citation omitted).

[91]  *Id.*

[92]  *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring).

[93]  *Palmer v. Britton Industries*, 662 F. App'x 147, 150 (3d Cir. 2016).

[94]  *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (internal quotation marks, brackets, and citation omitted).

remarks," the evidence "is not direct."[95] As one might expect, this is no easy task: the Third Circuit describes this as a "high hurdle" for plaintiffs.[96]

Here, Gillis asserts "there is no dispute that Mr. Plankenhorn, the decision-maker, took adverse employment action, i.e., revoking [Gillis's] access, in response to her statement that she would be exercising her FMLA leave."[97] According to Gillis, "[t]he statements are also sufficiently factually and temporally connected to the hiring of the CFO to demonstrate a discriminatory motive."[98] But Gillis is wrong on both fronts.

As a preliminary matter, Gillis offers no direct evidence that STEP's decision to promote Kiessling, rather than Gillis, to CFO was motivated by either Gillis's decision to take FMLA leave or her disability. Gillis asks the Court to infer discriminatory intent based on Plankenhorn's subsequent decision to revoke Gillis's access to STEP's network and building. But inferences are, by definition, circumstantial evidence—not direct evidence.[99] Accordingly, any claims of discriminatory retaliation based on STEP's refusal to promote Gillis must be considered under the *McDonnell Douglas* burden-shifting framework.

---

[95] *Id.*
[96] *Palmer*, 662 F. App'x at 150; *see also Anderson*, 621 F.3d at 269 ("We have referred to these requirements as creating a 'high hurdle' for plaintiffs.").
[97] Doc. 31 at 14.
[98] *Id.*
[99] *Torre*, 42 F.3d at 829.

Additionally, STEP adamantly denies Gillis's claim that it's decision to revoke her access to the organization's network and building was motivated by discriminatory animus.[100] Gillis's assertion that STEP conceded this point is simply disingenuous. As such, the Court must analyze the evidence presented and determine whether it constitutes direct evidence of discriminatory intent. The Court has done so and concludes it does not.

During his deposition, Plankenhorn testified that he revoked Gillis's network and building access for two reasons: (1) respect for Gillis's request to focus solely on her recovery; and (2) concern that Gillis, disgruntled after being denied promotion, might retaliate against the organization.[101] This explanation comports with the relevant communications contemporaneous to Plankenhorn's decision to revoke Gillis's access. Specifically, on March 8, 2019, after receiving Gillis's email stating that she "will be using [her] FMLA as much as possible and will only

---

[100] *See* Doc. 25 at 15 (asserting that retaliation for the decision to revoke Gillis's access to the organization's network and building "was business based—a concern that disgruntled Gillis would retaliate—and not discriminatory") (citing Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) 249:15–252:25.).

[101] *See* Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) 250:6–251:5 ("Q. And in response to" Gillis's March 7, 2019 email stating that she will work only when absolutely necessary so she can focus on her recovery, "you also revoked her e-mail at STEP. Correct? A. That is correct. Q. And you also deactivated her key fob to get entry to the building. Is that correct? A. That is correct. Q. And why did you do that? A. So based on her response when I did provide her with the information about Ms. Kiessling being the new CFO, and when she responded back to me that while ultimately it was my decision, she was also displeased with that. You know, I did have concern about the materials and information that she had access to. And so really out of respect to that, I felt like it was in the best interest of the agency. And also it gave her an opportunity to really focus on that recovery as well. So between those two things, I guess.").

work when absolutely necessary so that [she] can concentrate on [her] physical

therapy and recovery from here on out,"[102] Plankenhorn texted Gillis the following:

> [B]ased upon my desire to ensure you can focus on
> what's most important, your recovery, I asked Gene to
> take you off the network. You said you need to
> concentrate on therapy and recovery and I agree 100%
> and don't want us asking or expecting work from you
> during this time. Please let HR know what availability
> you have and we'll go from there.[103]

That same day, Plankenhorn described the events at issue in an email to his

attorney:

> I offered the CFO position to [Kiessling], and she
> accepted. As predicted, this has made [Gillis] very upset.
> She is out on FMLA and cleared to work part-time from
> home. She quickly communicated to me and Traci (e-
> mail) that she should only be asked to work if absolutely
> necessary as she needs to focus her attention on her
> recovery and therapy. She also asked Traci to come to
> her home and pick up the files she was working on. With
> that statement, that action, and as upset as she is to the
> information, I had her locked out of the fiscal database,
> including our network (e-mail, work files, etc.). I felt
> (feel) there may a risk to the agency.[104]

In none of the emails, text messages, or deposition testimony Gillis cites does

Plankenhorn provide the type of explicit acknowledgement of discriminatory intent

required to establish direct evidence under *Price Waterhouse*.[105]

---

[102] Doc. 27-2, Ex. B at 73 (Gillis Dep. Ex. P4 – Mar. 7, 2019**,** Gillis & Plankenhorn Emails).

[103] Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019**,** Plankenhorn & Gillis Text Messages).

[104] Doc. 27-4, Ex. D at 371–72 (Plankenhorn Dep. Ex. D9 – Mar. 8, 2019 Plankenhorn Email).

[105] *Contra Deane v. Pocono Medical Center*, 142 F.3d 138, 149 (3d Cir. 1998) (holding that call from employer's human resources representative "terminating Deane because of her 'handicap' is uncontroverted direct evidence that Deane suffered an adverse employment

Gillis is entitled to argue that the Court should infer from the timing of the adverse actions and the insinuations implicit in Plankenhorn's statements that the actions were discriminatory. However, inferences from coincidental timing and insinuations from arguably suggestive language are not direct evidence.[106] As such, Gillis's claims of discrimination based on Plankenhorn's decision to revoke her access to STEP's network and building must instead be considered under the *McDonnell Douglas* burden-shifting framework as well.

## B.    Circumstantial Evidence

The *McDonnell Douglas* framework unfolds in three steps. The plaintiff must first establish a *prima facie* case of discrimination.[107] If the plaintiff makes out a *prima facie* case, the evidentiary burden of production shifts to the employer to present a legitimate, non-discriminatory reason for the adverse action.[108] And if the defendant makes this showing, "the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[109] Importantly,

---

action because of her employer's perception of her disability"); *Deneen v. Northwest Airlines*, 132 F.3d 431, 434, 436 (8th Cir. 1998) (holding that plaintiff, who prevented from returning to work because she was pregnant, presented direct evidence of discriminatory intent by showing that her manager explicitly stated that she could not return to work "because of her pregnancy complication"); *U.S. Equal Opportunity Commission v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 654–55 (W.D. Pa. 2017) (holding that plaintiff presented direct evidence of discrimination because the manager explicitly stated that the plaintiff's pregnancy was the reason why he took the adverse action).

[106] *Torre*, 42 F.3d at 829.
[107] *Daniels v. School District of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).
[108] *Id*.
[109] *Id*. (internal quotation marks and citation omitted).

the shifting burden concerns only the evidentiary burden of production; "the plaintiff has the ultimate burden of persuasion at all times."[110]

Using this rubric, the Court finds that although Gillis presents a *prima facie* case of discrimination, STEP offers legitimate, non-discriminatory reasons for the alleged adverse actions that Gillis does not impugn or expose as simply pretextual. Accordingly, summary judgment is proper.

### 1.    *Prima Facie* Case

As discussed, to establish a *prima facie* case of retaliatory discrimination under the FMLA, Gillis must show (1) she is protected under the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to Gillis's exercise of her FMLA rights.[111] Relatedly, to set forth a *prima facie* case under the ADA and PHRA, Gillis needs to establish "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."[112] Here, STEP argues only that Gillis fails to show (a) she suffered an adverse employment action, and (b) a causal

---

[110] *Id.*

[111] *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 151 (3d Cir. 2017).

[112] *Taylor*, 184 F.3d at 306.

link between any such action and her disability or FMLA leave.[113] But the Court

finds both arguments unconvincing.

### a.     Adverse Employment Action

For purposes of the FMLA, ADA, and PHRA, an employment action

qualifies as "adverse" if it is "serious and tangible enough to alter an employee's

compensation, terms, conditions, or privileges of employment."[114] Here, STEP

argues that neither its refusal to promote Gillis nor the restrictions imposed on her

access to the organization's network and building constitute "adverse employment

actions."[115] In response, Gillis simply pretends that STEP admits that the disputed

decisions qualify as adverse employment actions, asserting there "is no dispute that

[Gillis] was protected under the FMLA, or that the alleged discriminatory conduct

can be categorized as adverse employment decisions."[116] But that's not true. The

Court finds this tactic (which Gillis employs repeatedly) confusing and unhelpful:

baldly stating that certain issues are not in dispute when they are, in fact, disputed

does no service to her case. Moreover, it's unnecessary—both employment actions

are sufficiently "serious and tangible" to qualify as "adverse."[117]

---

[113]  *See* Doc. 25 at 11–14; Doc. 35 at 4–8.

[114]  *Cunningham v. Nordisk*, 615 F. App'x 97, 100–02 (3d Cir. 2015) (citing *Storey v. Burns International Security Services*, 390 F.3d 760, 764 (3d Cir. 2004)).

[115]  Doc. 25 at 14 n.3; Doc. 35 at 4–7.

[116]  Doc. 31 at 7.

[117]  *Cunningham*, 615 F. App'x at 100.

First, STEP argues that Gillis fails to show that its decision to promote Kiessling, rather than Gillis, to CFO constitutes an adverse employment action because Gillis never applied for the position.[118] According to STEP, in Gillis's "first inquiry with Mr. Plankenhorn about the position she was outwardly unsure if she would apply."[119]

But STEP ignores two important considerations: (1) prior to Gillis taking FMLA leave, the organization established a "succession plan" that designated Gillis as the intended replacement as CFO upon Staci Lowe's retirement;[120] and (2) Plankenhorn did not inform Gillis of the CFO vacancy until after he selected Kiessling as Lowe's replacement.[121] This is not a situation where Gillis knew of the opening but declined to apply either because it was not publicly posted[122] or because she felt applying would be futile.[123] Here, Gillis was never given a chance to apply—a fact exacerbated by her understandable belief that she was assured the

---

[118]   Doc. 25 at 14 n.3 (citing *Bates v. Tandy Corp.*, 186 F. App'x 288, 293–94 (3d Cir. 2006) (*prima facie* case for failure to promote claim requires application and rejection to establish adverse action)).

[119]   *Id*. (citing Doc. 27-2, Ex. B at 95 (Gillis Dep. Ex. P12 – Mar. 7, 2019, Gillis Email)).

[120]   Doc. 27-4, Ex. D at 368 (Plankenhorn Dep. Ex. D7 – Oct. 17, 2019 Lowe Letter) (Lowe: "The Assistant Chief Financial Officer position was created to be an extension of the responsibilities of the [CFO], act on behalf of the CFO when the CFO was not present, and ultimately to succeed the CFO.").

[121]   Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn & Gillis Text Messages).

[122]   *See McLintock v. City of Philadelphia*, 504 F. Supp. 3d 411, 423 (E.D. Pa. 2020) (holding that employer's decision not to appoint plaintiff as CFO "was not an adverse employment action" because plaintiff "knew of the opening but declined to apply because it was not publicly posted").

[123]   *See Bates*, 186 F. App'x at 293–94 (affirming district court holding that plaintiffs "cannot state a *prima facie* case of failure to promote" when they never applied because they felt "doing so would have been futile").

position due to the existing succession plan. Given these circumstances, denying Gillis an opportunity for recovery because she did not apply for the job would be perverse.

Second, STEP argues that Gillis cannot show that Plankenhorn's decision to temporarily restrict her access to the organization's network and building was "sufficiently severe" to constitute an adverse employment action.[124] STEP explains that its "email and facility access limitation occurred after [Gillis] had indicated her desire (after the promotion decision was made) to restrict her work from home while on leave," and that "there is no evidence in this record showing that Gillis ever reacted to, or complained about[,] this decision when it occurred, that it was somehow preventing her from doing her job, or that she was unable to complete work on the audit as referenced in her email."[125] Further, STEP emphasizes that "Gillis returned to duty at STEP following her leave with continuing physical restrictions, as she was working half-days, but she had access to all the information she needed."[126]

But the Court finds this argument unpersuasive. While Gillis was on leave, Plankenhorn prevented her from accessing the network or entering the building, and either directly monitored or revoked her access to her emails.[127] Gillis

---

[124] Doc. 35 at 4–7.
[125] *Id*. at 5–6.
[126] *Id*. at 6.
[127] Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn & Gillis Text Messages).

challenged the need for these restrictions, noting that her "FMLA paperwork clearly states that [she] can answer emails, etc." and expressed concern about certain grant requirements that fell under her purview.[128] But Plankenhorn dismissed these concerns and decided to impose the restrictions.[129] Although there is a factual dispute about the extent to which these restrictions continued after Gillis returned from FMLA leave,[130] it is firmly established that STEP completely denied Gillis access to STEP's network and building while she was on leave starting March 7, 2019.[131] STEP cites no case law supporting its position that completely denying an employee access to her work materials and location is somehow not "serious and tangible enough to alter an employee's . . . terms, conditions, or privileges of employment."[132] That is unsurprising as this position is patently unsupportable.

---

[128] *Id*.

[129] *Id*.

[130] *Compare* Doc. 35 at 6 (arguing that "Gillis returned to duty at STEP following her leave with continuing physical restrictions, as she was working half-days, but she had access to all the information she needed") (citing Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint), *with* Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 58:22–59:5 ("Q. And then when you went back to STEP at the physical premises you were able to access at least some of your records? A. Correct. Q. And that would have been different from the situation when you were at home? A. Yes.").

[131] *See* Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 250:6–14 ("Q. And in response to that e-mail you received, you also revoked her e-mail at STEP. Correct? A. That is correct. Q. And you also deactivated her key fob to get entry to the building. Is that correct? A. That is correct."), *accord* Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 57:25–58:6 ("Q. When you were home on FMLA around March of 2019 when you resigned, March 12 of 2019, you talked about an even where your access was denied. Was it completely denied? A. Yes.").

[132] *Cunningham*, 615 F. App'x at 100.

Accordingly, the Court finds that both STEP's refusal to promote Gillis and its decision to revoke her network and building access constitute "adverse employment actions" for purposes of the FMLA, ADA, and PHRA.

### b.   Causation

The Third Circuit instructs that "[t]o establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing."[133] Here, Gillis argues that the timing of both STEP's refusal to promote her to CFO and Plankenhorn's decision to revoke her access to the organization's network and building "provides an inference of discrimination."[134] The Court agrees.

First, there is the refusal to promote. Before Gillis suffered her injury and took FMLA leave, STEP established a succession plan that placed Gillis first in line to replace the organization's CFO, Staci Lowe, upon her retirement.[135] Then, while Gillis was on FMLA leave recovering from surgery, Lowe retired and STEP

---

[133] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[134] Doc. 31 at 8–9.

[135] Doc. 27-4, Ex. D at 368 (Plankenhorn Dep. Ex. D7 – Oct. 17, 2019 Lowe Letter) (Lowe: "The Assistant Chief Financial Officer position was created to be an extension of the responsibilities of the [CFO], act on behalf of the CFO when the CFO was not present, and ultimately to succeed the CFO.").

abandoned its successful plan, promoting Kiessling (an accountant who, at the time, reported to Gillis) just two days after Lowe submitted her retirement letter.[136]

The unusually suggestive nature of the timing is further reinforced by Plankenhorn's actions vis-à-vis Head Start. As Gillis notes, on March 19, 2021, an official at Head Start asked STEP to submit a "key hire" request once it had a "candidate in mind."[137] Although STEP announced on March 7, 2019, that Kiessling accepted the CFO position and would be starting on March 30, 2019,[138] Plankenhorn wrote to Head Start on March 20, 2019, "requesting approval for the replacement of the current STEP CFO."[139] The Head Start Policy Council ultimately approved Kiessling as the new STEP CFO on April 10, 2019—two weeks after she started in that role.[140]

STEP responds that the timing of the decision to pass over Gillis for the CFO position "was merely coincidence," as "the promotion only opened because of the sudden retirement notice by the sitting CFO" and the summary judgment

---

[136] Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 247:6–13 ("Q. And [on March 4, 2019] Ms. Gillis was working modified duty. Is that correct? A. That is correct. Q. And was it the 6th or the 7th when Ms. Kiessling was offered the position? A. I believe it would be the 6th.").

[137] Doc. 32-1 (Gillis's Statement of Additional Material Facts) ¶ 90 (citing Doc. 27-4, Ex. D at 387–93 (Plankenhorn Dep. Ex. D.14 – Mar. 19, 2019 C. Romero, C. Hawk, R. Abbott, & J. Plankenhorn Email Chain)).

[138] Doc. 27-2, Ex. B at 96–97 (Gillis Dep. Ex. P13 – Mar. 7, 2019 J. Plankenhorn & K. Gillis Emails) (Plankenhorn to Gillis: "I offered the CFO position to Patti [Kiessling]. She did accept and will assume the role effective March 30.").

[139] Doc. 27-4, Ex. D at 394 (Plankenhorn Dep. Ex. D15 – Mar. 20, 2019 Plankenhorn Letter to Romero).

[140] Doc. 27-4, Ex. D at 383–85 (Plankenhorn Dep. Ex. D.12 – Apr. 10, 2019 STEP Head Start Policy Council Minutes).

record "shows no facts demonstrating that STEP's management had any role in [Staci] Lowe's decision to retire when she did."[141] But on this, STEP jumps the gun. It will have an opportunity to offer a legitimate, non-discriminatory explanation for its action; however, this explanation for the "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" (even if true) does not negate this Court's finding that the temporal proximity is, in fact, unusually suggestive.[142]

Second, Plankenhorn revoked Gillis's access to STEP's network and building immediately after she informed him that she would be taking her full FMLA leave.[143] Again, there may be a perfectly valid, non-retaliatory explanation for this action, but that's not the question here. At this stage in the *McDonnell Douglas* analysis, Gillis needs only to show that the alleged retaliatory action (revoking access) was sufficiently close in time to the protected activity (taking FMLA leave) to create an inference of discrimination. Gillis has met this burden.

---

[141] Doc. 25 at 12; *see also* Doc. 35 at 8 (arguing that Gillis "has only shown that someone else received a promotion to which she felt entitled, while [she] was coincidentally on FMLA leave," which, according to STEP, "is not enough to meet the causation requirement of her *prima facie* burden").

[142] *DeFlaminis*, 480 F.3d at 267.

[143] *See* Doc. 27-2, Ex. B at 73 (Gillis Dep. Ex. P4 – Mar. 7, 2019 Gillis & Plankenhorn Emails) (Gillis informing Plankenhorn that she "will be using her FMLA as much as possible and will only work when absolutely necessary"); Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn & Gillis Text Messages) (Plankenhorn telling Gillis that he took her "off the network," "deactivate[d] [her] key fob," and will be "monitor[ing] [her] e-mails too").

## 2.    Legitimate, Non-Discriminatory Reasons

As discussed, under the *McDonnell Douglas* framework, once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to present evidence supporting a legitimate, non-discriminatory reason for the adverse employment action.[144] Here, STEP asserts that it promoted Kiessling, rather than Gillis, to CFO because Kiessling possessed "superior interpersonal skills";[145] according to Plankenhorn, Gillis "did not work well with the people she would need to supervise or with [Plankenhorn] and the management team."[146] And, as discussed, STEP offers two legitimate, non-discriminatory reasons for why Plankenhorn revoked Gillis's network and building access: (1) respect for Gillis's request to focus solely on her recovery; and (2) concern that Gillis, disgruntled after being denied promotion, might retaliate against the organization.[147] With that, STEP has met its burden.

---

[144] *Daniels*, 776 F.3d at 193 (2015).

[145] Doc. 25 at 18.

[146] Doc. 35 at 12.

[147] *See* Doc. 27-4, Ex. D (Plankenhorn Dep.) 250:6–251:5 ("Q. And in response to" Gillis's March 7, 2019 email stating that she will work only when absolutely necessary so she can focus on her recovery, "you also revoked her e-mail at STEP. Correct? A. That is correct. Q. And you also deactivated her key fob to get entry to the building. Is that correct? A. That is correct. Q. And why did you do that? A. So based on her response when I did provide her with the information about Ms. Kiessling being the new CFO, and when she responded back to me that while ultimately it was my decision, she was also displeased with that. You know, I did have concern about the materials and information that she had access to. And so really out of respect to that, I felt like it was in the best interest of the agency. And also it gave her an opportunity to really focus on that recovery as well. So between those two things, I guess.").

### 3.      Pretext

Presented with these non-discriminatory reasons for refusing to promote Gillis and revoking her access to the organization's network and building, Gillis assumes the burden of showing by a preponderance of the evidence that these reasons are pretextual.[148] For this, Gillis must point to "evidence of inconsistencies and implausibilities in [STEP's] proffered reasons for discharge which *could* support an inference that [it] did not act for nondiscriminatory reasons."[149] That said, "[t]he question is not whether [STEP] made the best, or even a sound, business decision; it is whether the real reason is discrimination."[150] Gillis is held to the "preponderance of the evidence" standard—that is, she must prove it is more likely than not "that [the] defendant's proffered reason was a pretext for discrimination."[151] She has not met this burden.

### a.      Refusal to Promote

For the refusal to promote, Gillis offers a variety of arguments for why STEP's stated basis for this decision is pretextual. The Court addresses each argument in turn.

First, Gillis argues that STEP's claim about her deficient "interpersonal skills" is contradicted by the "glowing employment evaluations" she received

---

[148]  *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 555 (3d Cir. 2009).
[149]  *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 205 (3d Cir. 1987).
[150]  *Willis v. UPMC Children's Hospital of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015) (brackets and citations omitted).
[151]  *Parker*, 309 F. App'x at 555.

during her time at STEP, many of which "post-date" the events underlying

Plankenhorn's concerns about her fitness for a managerial role.[152] But as the Third

Circuit has long held, "[p]retext is not established by virtue of the fact that an

employee has received some favorable comments in some categories or has, in the

past, received some good evaluations."[153] Gillis's performance reviews and the

positive remarks about her ability focus primarily on her technical skills as an

accountant and her work ethic[154]—attributes that STEP and Plankenhorn do not

challenge or disparage. Indeed, in emails sent contemporaneous to the adverse

action, Plankenhorn explained that concerns about Gillis's interpersonal skills

compelled him to deny her the promotion despite her "fantastic" abilities as an

accountant.[155]

The performance evaluations contain only one category that arguably

concerns the character traits at issue here: "Teamwork and Customer Service."[156]

But the commentary on this category does not address Gillis's relationship with the

STEP leadership team or any of the identified conflicts that animated

---

[152] Doc. 31 at 17; *see also* Doc. 27-4, Ex. D at 313–57 (Plankenhorn Dep. Ex. D3 – Gillis Performance Reviews).

[153] *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992).

[154] Doc. 27-4, Ex. D at 313–57 (Plankenhorn Dep. Ex. D3 – Gillis Performance Reviews); *see*, *e.g.*, *id.* at 316 ("Her expertise and work ethic is top-notch!"), 318 ("Kelly's work ethic is exceptional.").

[155] Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email) ("[Gillis] is a fantastic accountant but does not project and promote the inter-personal skills I feel . . . necessary in her current position let alone moving forward if she were to take on the CFO role.").

[156] Ex. D at 313–57 (Plankenhorn Dep. Ex. D3 – Gillis Performance Reviews).

Plankenhorn's concerns.[157] And, as STEP asserts, the summary judgment record

contains an abundance of uncontested evidence regarding Gillis's longstanding

tensions with other STEP employees—in particular, former CSO and CEO Terry

Roller, HR director Jean Myers, and Plankenhorn.[158] Most relevant here, Gillis

herself has repeatedly acknowledged these tensions and described them as the basis

for the alleged "retaliatory harassment" she experienced.[159] Gillis characterized

these tensions as an "ongoing issue" that extended over a two- to three-year

period—starting long before she went on FMLA leave.[160] Additionally, in the

---

[157] *Id.*

[158] *See* Doc. 25 at 18–20.

[159] Doc. 1 ¶ 23 ("During the course of her employment, [Gillis] made numerous complaints about the way financial department and human resource issues were handled by [STEP]. As a direct result of voicing her concerns, [Gillis] was subjected to retaliatory harassment, including the making of false accusations against [Gillis] by two STEP employees, Terry Roller and Jean Myers. Upon information and belief, these false accusations were communicated to CEO, James Plankenhorn, in private, closed-door meetings and [Gillis] was deprived of the opportunity to defend herself or otherwise respond. As a direct result of [Gillis'] legitimate complaints and these false accusation, [Gillis] was retaliated against, which caused and/or contributed to the hostile work environment created by [STEP]."); *see also* Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint) ("Over the years, I have had multiple issues with leadership including Terry Roller and Jean Myers. Terry Roller was the President of STEP at the time I was hired. He did not care for me because I was not a 'yes' man. I have never been afraid to voice my opinion when it came to what I felt was in the best interest of the agency. This resulted in harassment by Terry Roller . . . . Jean Myers was my former employee in the Fiscal Department. Terry Roller appointed her to an HR position due to an agency necessity, even though she wasn't qualified. Over the years, she has done a poor job in Human Resources but has been rewarded for her lack of performance and is now the Chief of Human Resources. Over the years that Jean was in HR, there have been multiple instances where I have questioned the way certain things were being done, and have pointed out errors or issues. Every time that this occurred, Jean retaliated against me or the fiscal department.").

[160] Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 21:11–22:1 ("Q. So there are no other reasons that you want to cite or can cite that are indicative of what you felt Mr. Plankenhorn's personal feelings towards you, other than the fact that he hired somebody else for the CFO position? A. I do believe that Jim did not care for me. And I think that that was an ongoing issue, yes. Q. How long was it an ongoing issue? Over what period of time? A. I would say approximately—

emails Plankenhorn sent to his attorney in March 2019 explaining in real time the reason he decided against promoting Gillis to to CFO, Plankenhorn cited only Gillis's lack of people skills and poor relationships with other senior STEP officials:

> [Gillis] has rubbed many people the wrong way, including my HR Chief (Jean Myers), Terry [Roller] back when he was here, as well as quite a few program managers/directors. I have spoken with Traci [Lowe] about my concerns many times over the past several years and to be quite honest, Traci has not been able to affect any positive change. It is parament for me to promote, foster, and require the type of atmosphere that has both fiscal and operations working together as a cohesive team. Based upon all my observations, while there are some in operations that are not the most capable, they have good attitudes and are willing to work together. In my opinion, while Kelly may be highly capable, she lacks the people skills and therefore I cannot trust or have confidence in her ability to lead the way I feel the department or the agency needs to be lead.[161]

Against this backdrop, Gillis's positive performance reviews do not qualify as the type of "inconsistencies" that could "support an inference that [STEP] did not act for nondiscriminatory reasons."[162]

Second, Gillis notes the existence of the succession plan that had her slated to assume the CFO role upon Staci Lowe's retirement.[163] But it's unclear why

---

and I don't know if it's longer than this, but I would say approximately three—two, three years.").

[161] Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email).
[162] *Sorba*, 821 F.2d at 205.
[163] Doc. 31 at 17.

Gillis considers this evidence of pretext. Accepting that Gillis was designated Lowe's successor as CFO, there is no dispute that STEP abandoned this plan and elevated Kiessling instead. The question here is whether STEP's stated reason for refusing to promote Gillis—that is, Gillis's poor interpersonal skills and tensions with STEP senior management—is genuine or simply a pretext for a discriminatory motive. Given Plankenhorn's contemporaneous statements about his growing concerns "over the past several years" and inability to "affect any positive change" in Gillis's attitude and relationship with other STEP officials,[164] the existence of a prior succession plan does not contradict or undermine STEP's proffered basis for this adverse action.

Third, Gillis argues that Kiessling was "objectively unqualified for the CFO position, as shown by her lack of experience," and because she "did not possess the minimum qualifications, and had actually quit prior to being offered the position."[165] As proof, Gillis cites Plankenhorn's email to STEP's outside counsel reporting that "he thought hiring Ms. Kiessling for the CFO position would be taking 'a step or two more backwards' for the company."[166] But this argument falls short on both the facts and the law.

---

[164] Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email).

[165] Doc. 31 at 19.

[166] *Id.*; *see also* Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email) ("Trust me, I fully expect there could/will be more fallout from the decision not to consider Kelly. I also expect she will move on and try to hurt me and/or the agency in the process. However, I feel strongly that for STEP to move forward and have the type of respectful

Starting with the facts, the summary judgment record does not support

Gillis's claim that Kiessling was "objectively unqualified for the CFO position."[167]

To be sure, Gillis raises this point repeatedly,[168] but as STEP notes, "Kiessling had

seven years of experience working with non-profit accounting at STEP by the time

of her promotion" and "had significant and extensive management experience in

her previous jobs as a VP of Finance, Director of Finance, and CFO at other for-

profit entities."[169]

Additionally, Gillis takes Plankenhorn's statement about moving "a step or

two more backwards" out of context to imply that Plankenhorn himself viewed

Kiessling as unqualified. Here is the relevant portion of the email in question:

> I am not planning to consider Kelly [Gillis] moving into
> Traci [Lowe]'s role. What I am thinking about doing,
> however, is talking with Patti Kiessling about the
> position. Patti is the one person leaving (last day at the
> end of this week) and of course, is supervised by Kelly.
> Patti has great potential. Do you feel I have any
> obligation (from a risk management perspective) to offer
> the position to Kelly? Trust me, I fully expect there
> could/will be more fallout from the decision not to
> consider Kelly. I also expect she will move on and try to
> hurt me and/or the agency in the process. However, I feel
> strongly that for STEP to move forward and have the
> type of respectful culture/environment I feel is necessary,

---

culture/environment I feel is necessary, I cannot see promoting her into a more responsible
position. Bottom line, we might take a step or two more backwards before we go forwards.").

[167] Doc. 31 at 19.

[168] *See id*.; *see also* Doc. 1 ¶ 32; Doc. 27-2, Ex. B (Apr. 23, 2021 Gillis Dep.) at 78:16–20 ("Q. In
paragraph 30 it says, Patti Kiessling was not qualified for the CFO position. Do you agree with
that? A. I do."); Doc. 32-1 (Gillis's Statement of Additional Material Facts) ¶¶ 79–80 (asserting
that Kiessling "never had any experience with non-profit accounting prior to working for
[STEP]," and "never had any experience with non-profit tax reporting").

[169] Doc. 35 at 13 (citing Doc. 27-4, Ex. D at 402–03 (Plankenhorn Dep. Ex. D16 – Kiessling CV)).

> I cannot see promoting her into a more responsible
> position. Bottom line, we might take a step or two more
> backwards before we go forwards. I guess I am willing to
> do this.[170]

Accepting Gillis's interpretation of Plankenhorn's statement about STEP "tak[ing]

a step or two more backwards before we go forwards" would require ignoring the

preceding three sentences regarding the expected fallout from denying Gillis the

promotion (i.e., "she will move on and try to hurt me and/or the agency").[171] When

considering STEP's motion for summary judgment, the Court is required to

interpret the evidence in the light most favorable to Gillis; that does not, however,

permit the Court to ignore context that undermines Gillis's position.

Moreover, as a matter of law, "[t]he question is not whether [Gillis] made

the best, or even a sound, business decision; it is whether the real reason is

discrimination."[172] Gillis may well be correct that she was "the most qualified

candidate for the position."[173] But proof that Plankenhorn made a poor business

decision does not establish that he made the decision for a discriminatory reason.

Fourth, Gillis asserts that "[t]he variance in Mr. Plankenhorn's own hiring

practices, the speed with which the position was filled, and his contradictory

statements about whether [Gillis] was even considered for the position also provide

---

[170]  Doc. 27-4, Ex. D at 369–70 (Plankenhorn Dep. Ex. D8 – Mar. 4, 2019 Plankenhorn Email).
[171]  *Id.*
[172]  *Willis*, 808 F.3d at 647 (brackets omitted).
[173]  Doc. 27-2, Ex. B at 93–94 (Gillis Dep. Ex. P11 – July 8, 2019 Gillis EEOC Complaint).

evidence of pretext."[174] But as with the succession plan, Gillis offers no explanation for why the circumstances surrounding Kiessling's promotion to CFO are evidence of discriminatory intent. Conversely, STEP explains that "Kiessling had already announced her departure for another position at the time then-CFO Traci Lowe unexpectedly announced her retirement," and, as such, "Plankenhorn had to act quickly so as to retain Ms. Kiessling at a time when STEP's fiscal department was particularly short-staffed, when he had determined that Gillis was not his choice, and before Ms. Kiessling left for the other position."[175]

It is not enough to say that STEP's actions deviated from their standard practice. When a defendant offers a valid, non-discriminatory basis for its adverse action, the plaintiff must point to facts in the summary judgment record that contradict, or are at least inconsistent with, the defendant's stated basis for the action.[176] Here, Gillis has failed to do that.

There is nothing in the summary judgment record that could lead a reasonable jury to conclude that Plankenhorn's concerns about Gillis's interpersonal skills and poor relationships with other members of the STEP management team—stated at the time, repeatedly affirmed in discovery, and

---

[174] Doc. 31 at 20.

[175] Doc. 35 at 14–15 (citing Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 205:14–16)).

[176] *See Sorba*, 821 F.2d at 205 (holding that at the summary judgment stage, the issue is "whether [the plaintiff] has pointed to evidence of inconsistencies and implausibilities in the employer's proffered reasons [for the adverse actions] which *could* support an inference than the employer did not act for nondiscriminatory reasons").

corroborated by Gillis herself—are a pretext for discrimination. Accordingly, Gillis has not carried her burden. To the extent Gillis's claims are predicated on STEP's refusal to promote her, they do not survive summary judgment.

### b.    Revoking Access

For the second alleged adverse action—STEP's decision to revoke Gillis's network and building access—Gillis contests both of STEP's proffered legitimate, non-discriminatory justifications. First, Gillis argues that Plankenhorn's claim that he revoked Gillis's access so she could "focus on her recovery" is "discriminatory on its face," as Gillis "did not request to have her access curtailed and her physician already approved her modified working schedule with accommodation."[177] Second, Gillis dismisses as "laughable" Plankenhorn's concern that she posed a security risk to the organization, noting that she "was never before accused of misusing or stealing company property" and "Plankenhorn had never before taken similar action against any other employee."[178] Laughable or not, Plankenhorn's concern about Gillis's risk to STEP appears genuine; Gillis has not established by a preponderance of the evidence that this stated basis for the adverse action was a pretext for discrimination.[179]

As a preliminary matter, Gillis is wrong that Plankenhorn's stated concern about her recovery is *per se* discriminatory. Although Gillis cites no legal authority

---

[177] Doc. 31 at 22.
[178] *Id.*
[179] *See Parker*, 309 F. App'x at 555.

43

for this position,[180] the Court presumes, based on other arguments Gillis raises in her Opposition, that she predicates this assertion on the United States Court of Appeals for the Eighth Circuit's 1998 decision in *Deneed v. Northwestern Airlines*.[181] But that case is inapposite. In *Deneed*, the plaintiff took leave because she was pregnant, and her employer then refused to allow her to return to work, asserting that it was "concern[ed] for her own safety."[182] But the court deemed this purported non-discriminatory rationale insufficient to overcome the direct evidence of discrimination—namely, the manager's statement that the plaintiff could not return to work "because of her pregnancy complication" and unwillingness to readmit her for work duties despite a doctor's note that she was fit to work.[183] Notably, although the court found the employer's stated "concern for her . . . safety" unavailing,[184] it did not hold that this proffered reason for the adverse action was "discriminatory on its face."[185]

Moreover, Gillis's claim that she "did not request to have her access curtailed" omits facts material to the pretext inquiry.[186] As STEP explains, the decision to limit Gillis's access to its network and building "occurred after [Gillis]

---

[180] *See* Doc. 31 at 22.
[181] 132 F.3d 431.
[182] *Id*. at 434.
[183] *Id*. at 434–35.
[184] *Id*.
[185] Doc. 31 at 22.
[186] *Id*.

had indicated *her* desire . . . to restrict her work from home while on leave."[187]
Once Gillis learned that she would not be promoted to CFO, she told Plankenhorn
that "[a]s soon as I have the final draft of the audit to the auditors, I will be using
my FMLA as much as possible and will only work when absolutely necessary so
that I can concentrate on my physical therapy and recovery from here on out."[188]
Given that Gillis—not Plankenhorn—first stated her desire to limit her work to
focus on her "physical therapy and recovery," her argument that STEP's purported
concern for her recovery is "discriminatory on its face" falls flat.[189]

That said, the summary judgment record indicates that this professed
concern for Gillis's well-being was likely pretextual. But, fatal for Gillis's claims,
the seemingly genuine reason behind this pretext is not discriminatory. Instead, the
evidence establishes that STEP was more likely than not motivated by its concern
that Gillis, angry about being denied the promotion, would retaliate against the
organization.

In the text messages Plankenhorn sent Gillis informing her that she would no
longer have access to the organization's network and building, Plankenhorn
focused solely on her recovery.[190] But after sending those text messages,

---

[187] Doc. 35 at 5.
[188] Doc. 27-2, Ex. B at 73 (Gillis Dep. Ex. P4 – Mar. 7, 2019 Gillis & Plankenhorn Emails).
[189] Doc. 31 at 22.
[190] Doc. 27-4, Ex. D at 373–76 (Plankenhorn Dep. Ex. D10 – Mar. 7–8, 2019 Plankenhorn & Gillis Text Messages) (Plankenhorn writing, first, that "[y]ou said you need to concentrate on therapy and recovery and I agree 100% and don't want us asking or expecting work from you

Plankenhorn emailed his attorney that he "had [Gillis] locked out of the fiscal database, including our network (e-mail, work files, etc.)" because he "felt (feel) there may a risk to the agency."[191] Plankenhorn then solicited his attorney's "thoughts on whether [Plankenhorn] can and should take a snapshot of [Gillis's] e-mail traffic before [he] give[s] her access back to them," explaining that he is "hesitant to go this route as I promote and adhere to confidentiality and privacy as much as possible."[192] These emails indicate that rather than focusing primarily on Gillis's health and recovery, Plankenhorn was mostly concerned about the risk a disgruntled Gillis posed to the organization—a fact Plankenhorn acknowledged during his deposition.[193]

---

during this time," and, second, that "[a]s you communicated, and I agree, your priority is and should be your therapy and recovery").

[191] Doc. 27-4, Ex. D at 371–72 (Plankenhorn Dep. Ex. D9 – Mar. 8, 2019 Plankenhorn Email).

[192] *Id.*

[193] *See* Doc. 27-4, Ex. D (Apr. 26, 2021 Plankenhorn Dep.) at 250:6–252:20 ("Q. And in response to that e-mail that you received, you also revoked her e-mail at STEP. Correct? A. That is correct. Q. And why did you do that? A. So based on her response when I did provide her with the information about Ms. Kiessling being the new CFO, and when she responded back to me that while ultimately it was my decision, she was also displeased with that. You know, I did have concern about the materials and information that she had access to. And so really out of respect to that, I felt like it was in the best interest of the agency. And also it gave her an opportunity to really focus on that recovery as well. So between those two things, I guess. Q. So she says she's displeased that the assistant CFO wasn't even told that you were hiring a CFO. Right? A. I don't recall that that was the conversation. I think she was displeased because I had hired Ms. Kiessling, not that she wasn't told about it. But that could be what the communication said. Q. Okay. And because she said she was displeased, you thought she was somehow a threat to the agency? A. I thought there was a possibility, yes. Q. And—and what type of threat are we—are we talking about here? So let's—you revoked her e-mail access. So you didn't want her communicating with anybody at STEP. Correct? A. My understanding is I revoked her network access, which included e-mail. So we monitored the e-mails, Ms. Lowe monitored the e-mails. So she didn't have access to the network, which would include, you know, the personnel pieces to the fiscal files. And whatever—whatever information is included in that, payroll. So, yes, she had access to a lot of sensitive information. And so revoking access

Gillis attempts to "laugh[]" away this concern, asserting that she "work[ed]
for [STEP] for seven years with exemplary employee evaluations and without any
discipline," and "was never before accused of misusing or stealing company
property."[194] But the Court finds this unpersuasive for two reasons. First, new
circumstances present new concerns and demand new considerations. Never before
had Gillis been denied a major promotion she felt entitled to. As the emails from
that time make clear, Gillis was very unhappy that someone she supervised—
someone she considered (and considers) unqualified for the position—leap-frogged
her to become CFO.[195] Given her history with STEP, Gillis may consider
Plankenhorn's concerns unjustified; they were not, however, irrational.

Second, as explained, "[t]he question is not whether [Plankenhorn] made the
best, or even a sound, business decision; it is whether the real reason is
discrimination."[196] Here, all evidence in the summary judgment record—the
contemporaneous documentary evidence and the deposition testimony—supports
STEP's claim that Plankenhorn revoked Gillis's access to the organization's

---

to the network, I believe, was also revoked access to the e-mail, in that sense.") (objections
omitted).

[194] Doc. 31 at 22.

[195] *See* Doc. 27-2, Ex. B at 96–97 (Gillis Dep. Ex. P13 – Mar. 7, 2019 J. Plankenhorn & K. Gillis
Emails) (Gillis to Plankenhorn: "Wow, I'm surprised that this decision was made without even
speaking to me about it before hand. I'm not happy about this turn of events, but ultimately it
is your decision."); Doc. 27-4, Ex. D at 371–72 (Plankenhorn Dep. Ex. D9 – Mar. 8, 2019
Plankenhorn Email) ("I offered the CFO position to the Accountant that was projected to leave,
and she accepted. As predicted, this has made the current Assistant CFO [i.e., Gillis] very
upset.").

[196] *Willis*, 808 F.3d at 647 (brackets omitted).

network and building "to protect STEP from an obviously disgruntled employee."[197] Aside from her personal belief that Plankenhorn's concerns were unjustified, Gillis offers no evidence that the concerns were not genuinely felt. Weighed against the evidence supporting STEP's legitimate, non-discriminatory reason for this adverse action, Gillis's arguments fail to establish by a preponderance of the evidence that this reason was pretextual.

## IV.   CONCLUSION

To maintain a claim of employment discrimination based on circumstantial evidence, a plaintiff needs to show that the alleged adverse actions were more likely than not motivated by discriminatory animus. Here, Gillis fails to do that. STEP offers legitimate, non-discriminatory reasons for its decisions not to promote Gillis (her poor interpersonal skills and history of conflict with STEP senior management) and to revoke Gillis's network and building access (risk of retaliation by a disgruntled employee). Based on the summary judgment record, the Court finds that these reasons are likely genuine—that is, they are not offered as a pretext for discrimination. Accordingly, Gillis's claims of discrimination do not survive summary judgment.

---

[197]  Doc. 35 at 17.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge